UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KURT ALLEN ORLOWSKI,

                              Plaintiff,              Case No.: 11-cv-15676
                                                      Honorable Julian Abele Cook
                    v.                                Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                              Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 13]**

        Plaintiff Kurt Orlowski brings this action pursuant to 42 U.S.C. § 405(g), challenging a

final decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") under the Social Security Act (the "Act").  Both parties have filed summary judgment

motions which have been referred to this court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

        For the reasons set forth below, the court finds that substantial evidence supports the

ALJ's decision that Orlowski was not disabled.  Accordingly, the court recommends that the

Commissioner's Motion for Summary Judgment [13] be GRANTED, Orlowski's motion [9] be

DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision

be AFFIRMED.

II.     **REPORT**

A.     **Procedural History**

On August 25 and 28, 2007, respectively, Orlowski filed applications for DIB and SSI, alleging disability as of April 22, 2006.[1]   (Tr. 116-26).   The claims were denied initially on January 7, 2008.   (Tr. 63-72).   Thereafter, Orlowski filed a timely request for an administrative hearing, which was held on January 26, 2010, before ALJ Denise McDuffie Martin.   (Tr. 31-60). Orlowski, represented by attorney Mikel Lupisella, testified, as did his brother, Chris Orlowski, medical expert ("ME") Larry Kravitz, and vocational expert ("VE") Stephanee Leech.   (*Id.*).   On May 19, 2010, the ALJ issued a written decision finding Orlowski not disabled.   (Tr. 14-30).   On October 28, 2011, the Appeals Council denied review. (Tr. 1-4).   Orlowski filed for judicial review of the final decision on December 28, 2011 [1].

B.     **Background**

1.     *Disability Reports*

In a September 8, 2007 disability report, Orlowski reported that the conditions limiting his ability to work are "panic/anxiety attack disorder."   (Tr. 159).   He reported that he woke up one morning with a panic attack, and now has them "all the time."   (*Id.*).   He reported that he missed work "several times" because of such attacks which made him feel he "could not work." (*Id.*).   He reported that he stopped working due to his attacks on April 22, 2006.   (*Id.*).   He had previously been employed as a pizza cook for approximately 33 years.   (Tr. 160).   Orlowski reported seeing two doctors for his condition, and taking Paxil for depression.   (Tr. 161-62).

In a function report dated October 15, 2007, Orlowski reported that he lives alone in a

---

[1] Orlowski's application for disability benefits lists an alleged onset date of April 2, 2006, (Tr. 116), but this appears to be a typographical error, as his application for SSI, his disability reports, and the ALJ's decision note an alleged onset date of April 22, 2006.  (Tr. 17, 123, 159).

house, and that his day consists of waking up, watching television, taking a shower, going to the library to look for a job and eating "sometimes." (Tr. 167). He reported that his condition "sometimes" affects his sleep and his ability to dress and shave. (Tr. 168). He reported being able to cook simple meals for himself, clean, do laundry, and mow the lawn, although these things take him longer than they used to due to issues with "motivation." (Tr. 169). He reported walking two to three times a day, being able to go out alone, shopping for food daily, and being able to manage his finances. (Tr. 170). He does not drive because he "lost [his] car while trying to get another job." (*Id.*). His hobbies include watching television, reading, and building scale models. (Tr. 171). He reported few social activities, noting, "Since I have no job or car and money, it [is] hard to get around." (Tr. 172). He reported that his condition affects his ability to lift, squat, bend, stand, walk, kneel or climb stairs, but did not report mental limitations related to his condition. (*Id.*). He reported being able to pay attention "for several minutes," and that he used to handle stress well but now does not handle well changes to his routine. (Tr. 172-73).

Orlowski's brother, Christopher, filled out a third-party function report on October 21, 2007. He reported spending 10-15 minutes a week with his brother checking in on him and driving him places. (Tr. 177). Christopher reported that Orlowski has a hard time keeping up his appearance and sometimes appears unbathed, with unclean clothes and unkempt hair and facial hair. (Tr. 178). He reported that Orlowski generally refuses to take his medications and does not eat well possibly "due to lack of money." (Tr. 179). He also reported that Orlowski needs frequent reminders to perform chores. (*Id.*). Christopher reported that his brother walks and rides in a car, but does not drive because he does not own a car. (Tr. 180). He shops for food and household items "several times a week." (*Id.*). He reported that Orlowski can take care of his finances, but that he would not trust him with a checking account because he had once

"stopped paying attention to his checking account balance" and "had to pay large penalties."
(*Id.*).  Christopher reported that Orlowski has to be reminded to keep appointments, and often
will not go unless he is taken by someone.  (Tr. 181).  Christopher reported that Orlowski's
condition affects his ability to complete tasks, concentrate, understand, follow instructions and
get along with others.  (Tr. 182).  He reported that Orlowski "doesn't seem to understand what he
needs to do to start working, won't follow through on appointments and filling out forms, [and]
is beligerant [sic] when people try to help him."  (*Id.*).  He reported that Orlowski can follow
spoken instructions "okay" and gets along "fine" with authority figures, but handles stress and
changes to his routine "poorly."  (Tr. 182-83).  He reported that Orlowski has a hard time
following through on tasks.  (Tr. 184).

In a January 24, 2008 disability appeals report, Orlowski reported that his condition had
changed in that he suffered from continued knee pain and anxiety with panic attacks.  (Tr. 185).
He reported no new limitations as a result of these conditions.  (*Id.*).  He reported taking no
medications for his conditions and that his conditions did not affect his ability to care for his
personal needs.  (Tr. 187-88).  However, he reported that he "cannot do activity [sic] due to
panic attacks and knee pain."  (Tr. 188).

### 2.    *Plaintiff's Testimony*

At the hearing, Orlowski testified that he stopped working after he had a panic attack on
his shift and his boss had told him that he could "no longer work under these conditions."  (Tr.
34).  Orlowski testified that what has been keeping him from working since then has been
"somebody actually giving me a job again in my life."  (Tr. 35).  He testified that he has been
"actively" looking for work for three-and-a-half years and that he filed for benefits not only to
try to get a job but also to "try to get me some sort of income going in my life."  (Tr. 35).  He

testified that he lived alone and that he was being treated by psychological services "mainly to try to get some form of state aid." (Tr. 36). He testified that he sees his case manager at New Passages "a couple of times . . . a month." (*Id.*).

Orlowski testified that after working as a pizza cook for 32 years he had a panic attack at work due, he believed, to his job "kind of get[ing] to me, so to speak." (Tr. 38). He testified to being able to wash his dishes, do his laundry, garden, mow the lawn, and shop. (Tr. 39-40). He is also able to drive, though he does not have a car. (Tr. 39). He testified to socializing with friends and family and enjoying building model cars and playing the guitar. (Tr. 40). He also watches television and enjoys shows like *CSI* and *Law and Order* and can follow the story lines. (Tr. 41).

### 3. *Christopher Orlowski's Testimony*

At the hearing, Christopher Orlowski testified that he sees his brother about once a week and has done so since his brother quit his job. (Tr. 42). He testified that Orlowski's demeanor had changed in that time in that he is now delusional about his ability to work at other types of jobs – he testified that Orlowski often pursues jobs that he could not realistically obtain or be qualified for. (Tr. 42-43). Christopher testified that he did not believe his brother could hold a job full time because he would require too much direct supervision. (Tr. 44). He testified that Orlowski has trouble filling out job applications and completing other job-seeking tasks without someone "walk[ing] him through every step of the process." (*Id.*). He also doubted Orlowski's ability to "conduct himself well in a job interview." (*Id.*). Christopher testified that he is in contact with Orlowski's case manager, and that she did not think he was making any progress, although he was not taking any medication. (Tr. 45). He testified that Orlowski was recently engaged in a plumbing training program but that he was not very positive about the training. (Tr.

46-47). He also testified that his brother keeps the interior of his house clean, including dishes and laundry, but has let the exterior go. (Tr. 49-50). He testified that Orlowski shops for food independently and is able to get to his counseling sessions on the bus alone. (Tr. 50-51).

> 4. *Medical Evidence*

As Orlowski does not challenge the ALJ's finding that his knee problems were not severe, the court will discuss the medical evidence only as it relates to Orlowski's mental conditions.

> a. *Treating Sources*

At an appointment on April 5, 2006, with his primary care physician Dr. James Walker, Orlowski reported "stress, problems."[2] (Tr. 217). However there is no other notation for this appointment relating to these two complaints. (*Id.*). At an April 12, 2006 appointment, Orlowski reported that taking medication such as Xanax and two other illegible medications "make him feel like a zombie." (*Id.*). However he had "no specific complaint" at this appointment, despite the fact that he "seems to be unhappy." (*Id.*). He was diagnosed with anxiety. (Tr. 216). On April 17, 2006, Orlowski reported a loss of his job as a result of continued heart palpitations. (Tr. 216). He reported that he felt that he could not work and quit his job. (*Id.*). He reported no anginal pain, but some dizziness upon exertion, although he was "rather vague about this." (*Id.*). He reported that he was "anxious and paranoid and feels he will die of [a] heart attack." (*Id.*). He was "also worried about his lack of a job." (*Id.*). Dr. Walker referred him for a psychological consultation and increased his Xanax dosage. (*Id.*). At an April 20, 2006 appointment, Orlowski reported continued depression and anxiety symptoms, but that

---

[2] At appointments with Dr. Walker on January 23, February 1 and 15, and March 8, 2006, Orlowski made no reports and there was no discussion about any mental issues. (Tr. 217-19). However, he was being treated at the time for high blood pressure and was noncompliant with his medication, resulting in dizziness, pain and other symptoms. (*Id.*).

he was not taking his medications as prescribed.  (Tr. 215).  He reported that he was "not finding any jobs but not looking either."  (*Id.*).  He was diagnosed with depression and determined to be noncompliant with medications.  (*Id.*).  On April 28, 2006, Orlowski stated that he "needed ideas for work," and Dr. Walker referred him to the psychologist.  (*Id.*).  Orlowski did not see Dr. Walker again, based on the notes, until November 6, 2006.  (*Id.*).  His brother was present at this appointment and expressed concern over depression symptoms.  (*Id.*).  Orlowski agreed that he felt depressed, lacked ambition and was not taking care of himself.  (*Id.*).  He was agreeable to see a therapist.  (*Id.*).  Dr. Walker also prescribed Effexor.  (*Id.*).  On May 1, 2007, another prescription for Effexor was ordered, but there were no notations that Orlowski was seen by Dr. Walker on this date.  (Tr. 214).

Orlowski was also treated by New Passages Behavioral Health and Rehabilitation Services, beginning in October 2008.  In a psychosocial assessment conducted on October 17, 2008, Orlowski reported that his main goal was "to get a job."  (Tr. 266).  He stated that he was not sure why he needed case management services, and that it was his brother who suggested that he receive psychiatric intervention.  (*Id.*).  His brother accompanied him to the appointment and stated that Orlowski had trouble getting and keeping employment. (*Id.*).  Orlowski reported being on Invega, a psychotropic medication prescribed by a prior doctor (presumably at Catholic Charities where he was previously being treated per the notes), and that he was compliant with medication.  (*Id.*).  He reported that Catholic Charities treated him from February to September 2007 and diagnosed him with schizophrenia.  (*Id.*).  Orlowski noted that he also had a bad knee, and that his knee was what was preventing him from obtaining or maintaining employment. (*Id.*).

Upon examination, Orlowski's appearance was disheveled and his mood irritable.  (Tr.

7

269-69).  He denied symptoms of mental illness and stated that he was tired of answering questions "over and over."  (*Id.*).  He was cooperative, but guarded, his speech was normal, his motor activity calm, and his thought process focused on the idea that his employers were discriminating against him because of his knee.  (*Id.*).  The doctor noted that he lacked insight into his illness and the need for intervention.  (*Id.*).  His affect was appropriate, although somewhat agitated when asked about prior substance abuse.  (*Id.*).  He was oriented to person, place and time, and he denied hallucinations and delusions, although the doctor noted that there were possible persecutory delusions related to his past and prospective employers.  (*Id.*).

In a psychiatric evaluation conducted on October 20, 2008, it was noted that Orlowski was referred by another psychiatric service center (presumably Catholic Charities as previously noted), however records from that provider are not in the file.  (Tr. 260).  He reported quitting his job two and a half years prior, after having a panic attack.  (*Id.*).  He denied having problems before that time.  (*Id.*).  He reported having been unable to collect unemployment because he quit rather than being fired.  (*Id.*).  He denied hallucinations, or suicidal, homicidal or psychotic thoughts.  (*Id.*).  He had never been hospitalized.  (*Id.*).  He reported having been diagnosed with "adjustment reaction" with "depression and anxiety."  (*Id.*).  He denied any manic symptoms.  (*Id.*).  He reported having been on Effexor, Cymbalta and one other antidepressant but was not following up.  (*Id.*).

Upon examination, it was noted Orlowski was dressed and groomed appropriately and was accompanied by his brother.  (*Id.*).  He was coherent, relevant and spontaneous, and his reaction was sad but he acted appropriately to the therapist.  (Tr. 261).  He reported sleeping "ok."  (*Id.*).  He was oriented to person, place and time, his memory was intact, and his fund of knowledge was adequate.  (*Id.*).  He was able to do math calculations and his overall intellectual

functioning was deemed to be within normal limits. (*Id.*). It was noted that he had low energy and motivation. (*Id.*). He admitted to drinking in the past but stopped seven to eight years prior. (*Id.*). He was diagnosed with major depression, recurrent, and assessed a Global Assessment of Functioning ("GAF") score of 45-50.[3] (Tr. 262; 264). It was also noted that he had anxiety and "some unrealistic thinking about getting [a] job." (Tr. 264). He was prescribed Prozac, which was refilled on December 16, 2008. (Tr. 272). On March 16, 2009, however, no prescription was given because he was not taking it regularly. (*Id.*).

At an appointment on November 17, 2008, Orlowski reported that his "job situation is still the same" and that he had not found a job yet and was living on his savings. (Tr. 255). He stated that he would "feel better about [him]self" if he had a job and was able to pay his bills, and he was not sure if medication was going to make any difference. (*Id.*). At an appointment on December 16, 2008, Orlowski reported still feeling bad about his job situation and was "bored sitting all day doing nothing." (Tr. 250). He reported that he would feel better with a job but that his medications "may be helping [him] a little bit – thinking clearly and maybe coping better." (*Id.*). At a March 16, 2009 appointment, it was determined that he was non-compliant with his medication. (Tr. 244). He was dressed and groomed appropriately and accompanied by his brother, who expressed frustrations that nothing was being done to help him. (Tr. 245). He reported that Orlowski would not take his medication as prescribed. (*Id.*). In the interview, Orlowski answered questions and was coherent, relevant and spontaneous, although his brother

---

[3] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas." *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 461 Fed. Appx. 433, 436 n.1 (6th Cir. 2012) (citations omitted).

reported that he does not answer questions rationally. (*Id.*). Orlowski kept saying that he wanted to get a job. (*Id.*).

In a "To Whom It May Concern" letter dated March 11, 2010, Orlowski's case manager from New Passages, Alena Clinkston, noted that his current diagnosis was major depression, recurrent, unspecified and that his previous prescription for Prozac was not renewed due to noncompliance. (Tr. 274). He was found to have been compliant with case management appointments, however, presenting with a "baseline of dysphoric mood and constricted affect." (*Id.*). His thoughts were "pre-occupied with employment" and he had "irrational ideas about getting a job." (*Id.*). Ms. Clinkston stated that Orlowski wrongly believed that his case manager was supposed to help him find employment. (*Id.*). She found his speech spontaneous and that he had difficulty carrying on small talk. (*Id.*). For these reasons, it was her opinion that Orlowski "may experience difficulties obtaining and maintaining employment." (*Id.*). She noted that in January 2010, Orlowski briefly obtained employment with a bathroom manufacturing company. (Tr. 275). He was satisfied with that work, but indicated that it was physically demanding. (Tr. 275). His brother notified her that he had lost that employment "because he wasn't able to keep up with the work load." (*Id.*).

Attached to her letter, Ms. Clinkston included a copy of a quarterly review of Orlowski's treatment plan. (Tr. 276-83). In it, Ms. Clinkston reports that Orlowski had met his objectives for his goals of psychiatric stability, physical health and safety, entitlements, housing and employment. (Tr. 276-80). She noted that Orlowski had reported that his mood had been "okay" despite the fact that he takes no medication. (Tr. 281). He also currently had no medical problems. (*Id.*). He was working with an attorney to pursue social security benefits and was receiving food stamps. (*Id.*). His home was in foreclosure and his brother was paying his utility

bills.  (*Id.*).  They were working on collecting documentation to reinstate his mortgage.  (*Id.*).

She also noted that Orlowski had obtained employment on January 27, 2010, and was happy

about it, although he expressed concern that the job was physically challenging.  (*Id.*).  He also

had been attending a 12-week plumbing program, but stopped after 10 weeks because he did not

feel it was benefiting him.  (*Id.*).  When asked if he was satisfied with his case management

services, he commented, "I don't know, I was under the impression that you were supposed to

help me develop a job plan."  (*Id.*).

> b.     *Consultative and Non-Examining Sources*

On December 17, 2007, Orlowski underwent a consultative mental examination with Dr.

Matthew Dickson and Limited License Psychologist Carrie Neubecker.  (Tr. 234-37).  Orlowski

reported having two panic attacks in April or May 2006.  (Tr. 234).  The first occurred when he

woke up to go to work one day.  (*Id.*).  The second occurred the following Thursday.  (*Id.*).  He

had since had no further panic attacks.  (*Id.*).  He quit his job after the attacks when his boss told

him he could not take the week off.  (*Id.*).  He reported trying to find work since that time.  (*Id.*).

Orlowski's brother reported that their sister believed Orlowski had a learning disability, and

Orlowski confirmed he had some problems with comprehension.  (*Id.*).  Orlowski denied taking

any medication or ever having received any mental health services.  (*Id.*).

Orlowski reported that his daily activities included going to the library to research work

opportunities and calling potential employers on a payphone.  (Tr. 235).  He also reported

cooking, cleaning and doing laundry.  (*Id.*).  He reported not being able to handle money well,

and his brother reported that he did not keep up his appearance or his house, and did not eat

healthily.  (*Id.*).  At the appointment, it was noted that Orlowski's hygiene and grooming were

adequate, although his hair was unkempt.  (*Id.*).  Orlowski reported not needing assistance in

scheduling or keeping appointments, although he did need transportation for such things.  (*Id.*).

Upon examination, the doctors found Orlowski's speech unimpaired and his stream of mental activity spontaneous and organized.  (Tr. 236).  There was no significant evidence of hallucinations, delusion or persecutions.  (*Id.*).  Orlowski denied sleep issues, but stated that he began worrying about not having a job as soon as he woke up in the morning.  (*Id.*).  The doctors found his mood and affect appropriate, although he characterized himself as silent, quiet and sad. (*Id.*).  He was oriented to person, place and time, he could remember five numbers forward and three backward, name three of three objects, three past presidents, the current president, three large cities, two famous people and two current events.  (*Id.*).  He could do simple calculations but did not fare as well on serial subtractions.  (*Id.*).  He correctly interpreted one of two proverbs, made accurate comparisons between objects, and made appropriate judgments of various situations.   (Tr. 236-37).   The doctors opined that Orlowski's condition "would moderately impair his ability to perform work related activities," and they recommended "psychological testing to rule out a learning disability or other cognitive impairment."  (Tr. 237). Orlowski was diagnosed with "Major Depressive Disorder, Mild," and an unspecified "Anxiety Disorder."  (*Id.*).  He was assessed a GAF score of 55 and given a "guarded" prognosis.  (*Id.*).

On January 5, 2007, Dr. Dennis Beshara completed a psychiatric technique form for Orlowski.  In it, he found that Orlowski suffered from an affective disorder, specifically major depression, and an anxiety-related disorder.  (Tr. 198; 201; 203).  He determined that Orlowski had mild limitations in activities of daily living and in social functioning, moderate difficulties in maintaining concentration, persistence and pace ("CPP"), and no episodes of decompensation, based on a review of Orlowski's medical records and self-reports.  (Tr. 208).  He concluded that the medical evidence of record did "not support a level of impairment . . . which would preclude

even unskilled work activity."  (Tr. 210).

On that same date, Dr. Beshara assessed Orlowski's mental residual functional capacity ("RFC").  (Tr. 239-241).  He found that Orlowski was not significantly limited in his ability to understand, remember and carry out very short and simple instructions.  (Tr. 239).  Nor was he significantly limited in his ability to: sustain an ordinary routine without special supervision; work in coordination/proximity to others without being distracted by them; or make simple work-related decisions.  (*Id.*).  However, Dr. Beshara found that Orlowski was moderately limited in his ability to: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and to be punctual with customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods.  (Tr. 239-40).  He found that Orlowski was still "capable of performing unskilled work."  (Tr. 241).

### 5.   *Medical Expert's Testimony*

ME Larry Kravitz testified at the hearing.  (Tr. 49).  He testified that Orlowski was diagnosed with major depressive disorder and anxiety disorder.  (Tr. 51-52).  He also noted that one of the record exhibits contained a reference to a prior diagnosis of schizophrenia, but said that he could find no documentation of that diagnosis and that there were no records in the file from the diagnosing facility.  (Tr. 51-52).  The ME then discussed the record evidence and testified that, based on his review, he could not disagree with Dr. Beshara's assessment.  (Tr. 52-54).  He noted, however, that there was a "fair amount of outstanding evidence" that, if presented, could generate a different conclusion.  (*Id.*).  Dr. Kravitz assessed Orlowski with mild restrictions in activities of daily living and social functioning and moderate limitations in

concentration, persistence and pace, with no episodes of decompensation. (Tr. 55). When asked

whether Orlowski had any work-related restrictions, Dr. Kravits responded:

> …I think he's capable of understanding and remembering simple and
> detailed instructions. He might have some difficulty consistently carrying
> out detailed instructions. I would limit him to brief and superficial
> workplace contacts based on the agitation, the unrealistic thinking, the
> somewhat isolated lifestyle, and I would limit him to ordinary levels of
> work stress.

(*Id.*).

### 6.   *Vocational Expert's Testimony*

VE Stephanee Leech testified that Orlowski's past work was classified as medium

exertion and semi-skilled. (Tr. 56). The ALJ asked the VE to imagine a hypothetical person of

Orlowski's age, educational and vocational background, who had no exertional limitations, but

who "would be limited to unskilled, simple, routine, repetitive work with brief and superficial

interaction with supervisors, coworkers and the public and would be limited to ordinary levels of

work stress." (*Id.*). She then asked the VE if such a person would be capable of performing

Orlowski's past work. (*Id.*). The VE testified that such a person could not do Orlowski's past

work. (*Id.*). The ALJ then asked if there were other jobs in the national economy that such a

person could perform. (Tr. 57). The VE testified that such a person could perform the jobs in

the medium exertion category, including assembly (a reduced range of 25,000 jobs in the

regional economy based on the nonexertional limitations), material handler (a reduced range of

12,000 jobs), packer (a reduced range of 7,000 jobs). (*Id.*). Such a person could also perform

jobs in the light exertional category, including assembly (reduced to 2,500 jobs), packer (reduced

to 10,000 jobs) and sorter (reduced to 2,000 jobs). (Tr. 57-58). The ALJ then asked if the VE's

testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 58). The VE

testified that it was. (*Id.*).

14

Orlowski's counsel then asked the VE if the hypothetical claimant could still perform such jobs if he was unable to "perform activities within schedule, maintain regular attendance, and be functional within customary tolerance" for "20 percent of a workday or workweek." (*Id.*).  The VE testified that such a limitation would preclude work.  (*Id.*).  Counsel then asked if a limitation that the hypothetical claimant would be "unable to complete their tasks without interruptions on [sic] psychologically-based symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods" for "20 percent of a workday or workweek" would preclude work. (Tr. 59).  The VE testified that it would.

### C.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of

15

age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

   D.   **The ALJ's Findings**

Following the five-step sequential analysis, the ALJ determined that Orlowski was not disabled.  At Step One she found that he had not engaged in substantial gainful activity since his alleged onset date of April 22, 2006.  (Tr. 19).   At Step Two she found the following impairments to be severe:  "depression, anxiety disorder, reference to schizophrenia, remote history of substance abuse."  (*Id.*).  At Step Three she determined that none of Orlowski's severe impairments, either alone or in combination, met or medically equaled a listed impairment.  (*Id.*). In doing so, she found that Orlowski had mild limitations in activities of daily living and social functioning, and moderate limitations in CPP, with no episodes of decompensation.  (Tr. 20). The ALJ then assessed Orlowski's RFC.  (Tr. 21).  She found him capable of performing:

> a full range of work at all exertional levels but with the following nonexertional limitations:  The claimant has the mental residual functional capacity to understand, remember and carry out unskilled, simple, repetitive, routine tasks and to interact appropriately with the general public, supervisors, and coworkers on an intermittent, brief and superficial

16

basis in an environment with ordinary levels of stress.

(Tr. 21).  At Step Four she determined that, based on this RFC assessment, Orlowski was not capable of returning to his past work.  (Tr. 26).  Finally, at Step Five she concluded that, based on Orlowski's age, education, vocational history and RFC assessment, in addition to VE testimony, there were a significant number of jobs in the national economy that he could still perform.  (Tr. 26).  Therefore he was not disabled.  (Tr. 27).

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility

of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

Orlowski asserts that the ALJ made several errors in her opinion, warranting reversal. The court will address each in turn.

*1.     Treating Physicians' Opinions*

Orlowski first argues that the ALJ failed to mention the treatment records of a "Dr. Wagner."  (Plf. Brf. at 7).  As the Commissioner points out, there is no "Dr. Wagner" in the record, and so the court assumes Orlowski is referring to Dr. James Walker, his primary care physician.  Contrary to Orlowski's assertions, the ALJ did reference Dr. Walker's treatment

notes in her opinion.  (Tr. 21-22).  The fact that she does not specifically mention the weight given to his "opinion" is, at most, harmless error, as Dr. Walker never actually rendered an "opinion" about Orlowski's mental condition for the ALJ to consider.  A diagnosis of a condition alone is not an opinion about a claimant's ability to perform work tasks.  *See Dukes v. Comm'r of Soc. Sec.*, No. 10-436, 2011 U.S. Dist. LEXIS 105526 at *16, 2011 WL 4374557 (W.D. Mich. Sept. 19. 2011) *quoting McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 U.S. App. LEXIS 11791, 2000 WL 687680 at *5 (6th Cir. May 19, 2000) ("[T]he mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual.").  Therefore, there was no error in the ALJ's failure to specifically mention the weight given to Dr. Walker's treatment notes.[4]

### 2.    *Orlowski's Desire to Work*

Orlowski asserts that the ALJ put too much stock in his repeated references to his desire to work, arguing that the desire to work does not equal an ability to do so.  While the ALJ mentioned Orlowski's repeated desire to find a job and the steps he had taken to do so, she also referred to numerous pieces of medical evidence that supported her ultimate determination that

---

[4] Orlowski also mentions Ms. Clinkston's report and discusses its findings in a paragraph.  (Plf. Brf. at 7).  However, he makes no argument regarding her findings or the weight the ALJ gave to them.  (*Id.*).  Therefore, any argument that he could have otherwise made has been waived.  *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted).  Furthermore, while Ms. Clinkston opined that Orlowski may have difficulty obtaining and maintaining employment, she did not make any specific findings as to Orlowski's recommended workplace restrictions or what types of jobs he could or could not do.  Nor did she specifically state characteristics of his condition that would negatively affect his ability to obtain and maintain work, referencing only a dysphoric mood, some irrational beliefs about his job prospects, and his inability to carry on small talk. (Tr. 274).  Therefore, just as with Dr. Walker, the ALJ's failure to assign weight to this "opinion" is, at most, harmless error.

he was capable of working.  She referenced not only Orlowski's primary care physician's notes, but the treatment notes from New Passages, from Ms. Clinkston, and from the consulting examiner.  (Tr. 21-25).  She also referenced his activities of daily living, including that "he goes to the library 'quite often,'" "does the cooking, cleaning and laundry," and did "his own grocery shopping."  (Tr. 23).  The ALJ's reference to Orlowski's desire to work was hardly the crux of her thorough analysis about his ability to work.

### 3.    *Moderate Limitation in Concentration Persistence and Pace*

Orlowski *mentions* that he had been assessed a moderate CPP limitation and diagnosed with major depressive and anxiety disorders, and then *cites* extensively from *Coakley v. Sec'y of Health and Human Servs.*, No. 90-70676, 1991 U.S. Dist. LEXIS 2397 (E.D. Mich. 1991).  (Doc. #9 at 7-8).  However, he does not make any actual *argument*.  While the court could find Orlowski's failure to articulate an argument regarding these matters results in a waiver, *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted), for the sake of completeness, the court will address the ALJ's decision with regard to Orlowski's moderate CPP and anxiety limitations.

The Commissioner assumed that Orlowski was challenging the ALJ's failure to include limitations related to his "concentration, persistence or pace" difficulties and/or limitations related to his "major depressive disorder and anxiety disorder" in the RFC and/or VE hypothetical.  (Doc. #13 at 8)  To the extent this accurately surmises Orlowski's intended challenge, that challenge lacks merit.  While it is true that once an ALJ determines that a

claimant has limitations such as the ones identified above, "he must craft a hypothetical question which encompasses, in concrete terms, the substance of that finding," *Bielat v. Comm'r of Soc. Sec.*, No. 02-70791, 2003 U.S. Dist. LEXIS 11722 at *31 (E.D. Mich. Jan. 29, 2003) *adopted by* 267 F. Supp. 2d 698 (E.D. Mich. 2003), the ALJ is not required to include any particular verbiage reflecting those limitations. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Rather, the ALJ satisfies her burden by "develop[ing] a complete and accurate assessment of [the claimant's] mental impairments," regardless of the specific verbiage used. *See e.g., Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

On this point, the Commissioner correctly analogizes this case to *Infantado v. Astrue*, 263 Fed. Appx. 469 (6th Cir. 2008). The plaintiff in *Infantado* had been assessed by a psychiatrist, Dr. Yousuf, with moderate concentration problems. Yet, Dr. Yousuf noted Infantado's daily activities, and concluded that Infantado "appears to be capable of performing simple tasks on a sustained basis." *Id.* The ALJ's RFC limited Infantado to "unskilled sedentary work." *Id.* at 471. After she was determined not to be disabled, Infantado appealed, challenging the ALJ's failure to include a specific "moderate concentration" limitation in the RFC. The Sixth Circuit rejected that argument, holding:

> The ALJ was not oblivious to the mental RFC assessment report, but expressly noted Dr. Yousuf's limitations in his decision. The hypothetical questions he asked of the vocational expert could have been more complete, but we do not find that they inaccurately portrayed plaintiff's substantiated limitations. Further, the conclusion drawn by the ALJ from the vocational expert's answers, i.e., that plaintiff retained the ability to perform unskilled sedentary work, is not inconsistent with Dr. Yousuf's opinion regarding plaintiff's functional limitations and is supported by substantial evidence.

*Id.* at 477.

In this case, despite imposing a "moderate restriction in concentration, pace and

21

persistence," the ME concluded as follows:

> …I think he's capable of understanding and remembering simple and detailed instructions.  He might have some difficulty consistently carrying out ***detailed instructions***.   I would limit him to brief and superficial workplace contacts based on the agitation, the unrealistic thinking, the somewhat isolated lifestyle and I would limit him to ordinary levels of work stress.

(Tr. 55) (emphasis added).[5]  Similarly, Dr. Beshara found Orlowski was moderately limited in his ability to maintain attention and concentration for extended periods of time, yet found that he nevertheless was "capable of performing unskilled work" and carrying out short and simple instructions on a sustained basis. (Tr. 239-41).  *See also* Tr. 210 (noting no level of impairment "which would preclude even unskilled work activity.").  He also found that Orlowski had the "ability to respond appropriately to changes in the work setting."  (Tr. 240).

While the ALJ's RFC and VE hypothetical did not expressly impose "concentration" or "anxiety" limitations, she incorporated both the ME's and Dr. Beshara's overall findings which did address those matters.  (*Cf. e.g.*, Tr. 21 (RFC) with Tr. 55 (ME testimony) and Tr. 56 (hypothetical to VE)).  In doing so, she appropriately described Orlowski's mental impairments in a manner consistent with substantial record evidence.  *Infantado*, 263 Fed. Appx. at 477; *Smith*, 307 F.3d at 379.

### 4.      Sufficiency of VE's Testimony

Finally, Orlowski argues that the VE's testimony was insufficient in that she testified to a "reduced range" of various positions without making specific findings.  He does not cite any cases supporting his position, and the record shows the ALJ complied with the regulations with

---

[5]  The implication of the ME's testimony, of course, is that while Orlowski would have difficulties consistently carrying out detailed instructions, he would not have those problems with simple instructions.  The ALJ's hypothetical to the VE, and her ultimate RFC, did not include an ability to follow "detailed instructions."  (Tr. 21, 56).

22

regard to her acceptance of the VE's testimony.   As the Sixth Circuit stated in *Beinlich v.*

*Comm'r of Soc. Sec.*, 345 Fed. Appx. 163 (6th Cir. 2009):

> Even if there were an inconsistency, the plaintiff has not pointed to any authority that the ALJ erred in his findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued his decision.  As an initial matter, neither the ALJ nor the VE is required to follow the DOT.  *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (holding that "the ALJ and consulting vocational experts are not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications").   The ALJ fully complied with SSR 00-4p, 2000 SSR LEXIS 8 when he asked the VE whether there was "any discrepancy between [her] opinions and the DOT standards for the requirements of the jobs [she] named."  *See Lindsley*, 560 F.3d at 606 (holding that the ALJ fulfilled his duties when he asked the VE whether there was any "discrepancy between your opinions and the DOT standards," even if the VE did not disclose a conflict).  As *Lindsley* makes clear, the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p, 2000 SSR LEXIS 8.  Id.  This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT.  The fact that plaintiff's counsel did not do so is not grounds for relief. See *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir.2008).

*Id.* at 168-69.

Here, the VE testified, upon questioning of the ALJ, that her testimony was consistent

with the DOT.  (Tr. 56-58).  Furthermore, Orlowski's counsel asked no questions of the VE

regarding her testimony's compliance with the DOT or with the regulations.  (Tr. 58-59).  The

ALJ was under no obligation to further inquire into the sufficiency of the VE's testimony under

these circumstances.  *Beinlich*, 345 Fed. Appx. at 168-69.

Nevertheless, the court finds the VE's testimony sufficient in this regard.  Contrary to

Orlowski's claim, the VE did make specific findings, testifying not only to the job categories

which Orlowski was capable of performing given his RFC, but also to the specific number of

positions that fell within the "reduced range" of which she spoke.  (Tr. 57-58).  Therefore, the

court finds that the ALJ properly relied on the VE's testimony.

For all of these reasons, the court finds that substantial evidence supports the ALJ's conclusion that Orlowski was not disabled.

## III.   CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Orlowski's Motion for Summary Judgment **[9]** be **DENIED**, the Commissioner's Motion **[13]** be **GRANTED** and this case be **AFFIRMED**.

Dated: November 7, 2012                     s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record

24

and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 7, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager